Case number 19-3286, Nebraska, Mary Canning v. Creighton University. Judge also note that Ms. Messal is joining by telephone conference only, so there's no video for the appellant. Alright. Ms. Messal, are you there? Yes, thank you, your honor. Please proceed. I'm Rebecca Messal. Yes, may it please the court, on the phone for Dr. Canning, Rebecca Messal, we're appealing from summary judgment under Rule 56, we're asking for reversal and remand. Her claims were age discrimination, retaliation, and a claim for being regarded as disabled. We're claiming, obviously, that the facts were hotly disputed and that the case should be turned around. She was a first-year resident, she was 57 years old, that's five-seven, whereas her classmates were all 25 to 30 years old, page 381. My client had recommendations when she started from three prominent Drexel University physicians, page 32. And I want to emphasize, after she started, she earned favorable evaluations at Creighton in six of her first seven months, both there and at the VA hospital, which is affiliated, pages 40 and 47. In November 2015, Creighton had failed to train her on a new computer software program and that caused her to get a lower score for that one month, not a failing score. Then she earned favorable reviews for December 2015 and January 2016, and a favorable six-month review in December 2015. One of her attending physicians described her as a reliable team player who handled complex cases, page 412. And another said she was a hard-working, conscientious resident, page 429. On the disability discrimination claim, we feel the district court erred on her first – that was the first claim for relief, page 16, because it decided a material fact, it should have been a jury instruction, that is, that Creighton regarded her as having a cognitive defect or as merely having a learning disability. The difference was material because the answer determined the outcome of the legal issue, which was whether she was a qualified person. The legal issue is dictated, of course, by 42 U.S.C. 121.12a. That's the definition of qualified person. The clinical competency committee had told its in-house psychologist in advance, Dr. Anderson, that the committee regarded her as having dementia, anxiety, or substance abuse problems. That's page 246. That's in the record, as is the requirement that she take a psych exam for the same reasons, page 413, as is the head of the committee accusing her of memory problems, page 488 and 489. The district court made the same error on the retaliation claim, page 17. Dr. Canning's protected activity was not disputed, so the legal issues and the district court's errors were, number one, did Creighton take adverse actions after her protected activity in March 2016, page 463? The district court overlooked the evidence of regular adverse actions taken before her termination. Number two, was there a causal connection after her protected activity to any adverse actions? By overlooking eight months of continually escalating adverse actions, the district court took the question of causation away from the finder of fact and said her termination was too long from when her lawyer wrote his demand letter, overlooking everything in between. The third legal question was, would the series of adverse actions dissuade a reasonable employee from the protected activity? Well, the district court erred by failing to adhere to the Burlington Northern test, we argued, because that's, you ask the question from the employee's perspective, not from the employer's perspective. And then on the age discrimination claim, the third cause of action, page 17, the district court found she had established her prima facie case, page 585, but one of the district court's errors was again in deciding the disputed material fact and holding that dementia slur was only a stray remark, whereas the record shows the first slur was part of this continuous age-related disparagement going on basically her entire employment, and another error was making a factual finding that the lack of medical knowledge... Counsel, this is Chet Smith. The stray remark, was that the remark made by a fellow resident, or is there another remark made by someone in authority? Right. The first one was by a fellow resident that got everything started, but then the head of the committee is the one that accused her of having memory problems after that, that was again page 48 and 89, and then there's testimony by the head of one of the other doctors, Dr. Porter, who was on the committee herself, that the committee told the first examining in-house psychologist basically what to say, and there's a question of whether the psychologist wrote it, or did the CCC committee write it that said they regarded her as having dementia or anxiety-producing, substance abuse anxiety. So yes, it did come from the very start from that one slur, but then it just kept going. They literally referred her for a psych exam, and then when the report came back in June, the psych exam stated why they had referred it. Well, for one thing, it had to do with computer problems, like we'd all have to get psych exams for computer problems, but no, it also said these other cognitive reasons, so they regarded her in the record over and over again as having cognitive problems. And by the way, when she was finally terminated in December, the reference strangely mimicked the original Dr. Anderson note in February, saying she was a danger to patients, so it seemed like less than a coincidence. But that first slur was this continuum that ended finally in January. Counsel, I thought Dr. Canning agreed to the psychological evaluation, at least the first one. Well, if agreement is something that you do without duress, she was told she had to, so it was under duress. She didn't have a choice other than to give up all of her rights. So I have to say no, she did it under duress. She was told to. But back to the age discrimination case, also this continuum was that the district court said that she lacked medical knowledge, and that was the reason for this fireable offense. Well, number one, it wasn't a fireable offense for anybody. Nobody had ever been fired for what she did. It was an error of omission. And then the other thing was all of the evidence of her supposed lack of medical knowledge was disputed because she had all of these favorable reviews both before and after she went back. So it was false to say she lacked medical knowledge. It was false to say she didn't understand her error, page 146. It was false to say her error of omission required termination. And it was false to say that the error was committed under direct supervision, page 135. The person that fired her, Dr. Chikofsky, admitted she didn't know of any other resident who was fired for such an error, pages 303 and 304. And Dr. Griffin, a long-tenured, well-thought-out faculty member who had directly supervised Dr. Canning, also said this happens twice a week or twice a month. It happens all the time. It was so frequent that it's in the record that Creighton has its own pharmacist giving talks to residents about the errors the pharmacist has to correct because they're residents. They're learning. And that's the whole point. She was treated differently because she was 57. And she got along famously with the older faculty. But it was a couple of people younger that were on this control committee. I thought from the district court's opinion that it was a nurse who spotted what could have been a disastrous failure to get the right med prescribed before the patient was discharged. You just said something about pharmacists. You said pharmacists correct this all the time. That isn't what happened here, is it? No, what my point is that, yes, it was the nurse who caught the omission. It wasn't a wrong prescription, which is different than an omitted. No, it was a failure to... Well, did the district court misdescribe an incident that sounds to me like putting a patient at very serious risk? I think it did, and I can't point to the page right this minute, but I think the whole thing was misdescribed as being something it wasn't. A lack of knowledge is different than a terrible omission. Counsel, what fact did the district court misstate in its opinion? And what's the record support so I can go double check and confirm that the district court got it wrong factually? It said that anybody making this error would be fired, and that was not true. Nobody ever gets fired for this type of error. So that was the biggest thing. The judge misunderstood and stated it and made it sound like anybody would get fired for this. Nobody gets fired for this, and that was throughout the record that we cited. But the other thing that also happened, as far as age discrimination, is that when they said to the committee that my client was under direct supervision at that time, she was not. And by the way, never even checked by Dr. Chikowsky, who had lied to the competency committee then that authorized her to go ahead and fire my client. But I see I've run over my ten minutes. May I save the rest of my time? Yes, you may, but just before you do, I was going to ask does the record show specific examples of others who committed the same mistake and were not terminated? No, the record shows that Dr. Chikowsky herself said she's never heard of anyone being terminated for that error. And also Dr. Griffin stating no one gets terminated for that type of error. It wasn't a missed prescription. It was an omitted prescription. So it being an error of omission is common. And by the way, when I was trying to talk about the pharmacist, the record shows that Creighton has its pharmacists come talk to residents about exactly these types of errors which are so common that the pharmacists by Creighton are asked to come speak to them about it just as they're being trained about these things. All right.  Mr. Buntain? Thank you, Your Honor. May it please the court, I'm David Buntain and I am counsel for Creighton University. We are here today to urge you to affirm the decision of Judge Girard. And we think that he did an excellent job of sorting through a lot of facts, many of which have no bearing on the issues that are in this case, and focusing on those facts which are important. As background, I think it's important to understand that this case involves the teaching of residents in an internal medicine program. Creighton University is located in Omaha. It has affiliation agreements with the Veterans Hospital and with Creighton Hospital, of which they train residents. The residency program is a three-year program. You start out with physicians who have medical degrees. Over a three-year period, they are given progressively more responsibility with the goal of moving them from being supervised to being independent. So at the end of the three years, they should be able to go out and practice independently as internists, both in clinical settings and in hospital settings. An important part of the program is that they are in both clinical settings and hospital settings. And part of the underlying issue in this case as far as Dr. Canning's performance is that the physicians with whom she worked who had favorable or more favorable impressions of her were generally in a clinic, non-hospital setting. Dr. Canning had tremendous difficulty in handling the portions of the rotation that were in the hospital settings. There's regular evaluation. She says in her brief several times there was no, she was never told what her failings or what her deficiencies were, how she wasn't meeting expectations. But the record is replete with examples of feedback that she was given through her various evaluations and through formal disciplinary documents. The evidence is also undisputed that Dr. Canning was not well prepared when she showed up. She was 57 years old. She had graduated from medical school eight years before. She went to a medical school in Ireland. The evidence is undisputed and she admits that the training for physicians in foreign medical schools is different. They do not have exposure to patients at the undergraduate level. During the eight-year period between when she graduated, I'm sorry, I should say it's a seven-year period, during the seven-year period she went to one eight-week program where she had some patient contact and that was at Drexel University. That was in 2011. She showed up in 2015, took an examination that's given to all incoming internists actually all across all of the various specialties. She scored in the lower 15% nationally as far as her preparation and that test is used to show where gaps of knowledge are. Counsel, would you respond to the plaintiff's allegation that Creighton did not train her appropriately in the use of the computer system or computer software, that somehow she was treated differently than the other students with respect to computer proficiency? I know that that is an allegation that she's made, that she was not given proper training. It really, you know, I don't think that there's a dispute that there were probably difficulties in doing that. What's undisputed, though, is that happened during the first year of her first year of residency, the first semester essentially, the first half year. It got to a point in December, she started July 1, middle of December, the clinical competency committee, which is made up of eight of the faculty members in the internal medicine area met and concluded that she was not meeting the expectations and had not progressed to the point where you would expect to see a first year resident. She was informed of that in January at a meeting on January 22nd and was given a memo which listed eight subcompetencies, and these are not Creighton subcompetencies, these are national subcompetencies that are established by the internal medicine specialty. And it gives specific examples of the problems that she was having. And at that meeting, and it's undisputed, she agreed that she should repeat her first year. That is, it's undisputed. She admits it in her deposition, she admits it in her answer. And she said in her deposition that she recognized that she did not have the same kind of training that other first year internal medicine residents had who were coming from Creighton University and other medical schools. She was not used to dealing with patients and managing patients. And so she agreed to do that. And part of the discussion that flowed from that was there were concerns that she was having difficulties in understanding and processing the information. There were knowledge gaps, she was having trouble processing the information. All of this is in the written document she was given. And it was suggested that she needed to have some assistance in sorting that out. There were concerns about whether there was some kind of a learning disability or cognitive problem. They ended up putting her on leave and asking her to have the fitness for duty test. Her lawyer objected to that. There was a negotiation between Creighton's lawyer and her attorney. She ended up agreeing to have the test. She had her own psychologist also do a test. Based on both of those evaluations, and I should note that the Creighton evaluation showed that she had some minor difficulties, but he didn't think it would prevent her from proceeding. They admitted her back into the program. They said, okay, you come back, you start over July 1 of 2016. How common is that to occur in the medical training program to have the requirement of a student to undergo what amounts to competency training or competency examination? Well, there's no evidence in the record one way or the other. I would think that it's fairly uncommon. But I think it's indicative that Creighton was concerned, wanted her to succeed, wanted to help her succeed, and was not being used as a way to penalize her in any way. In fact, she was readmitted. Other than the fact that she was 57, what was the basis for making that requirement? There were concerns that are reflected in her evaluation that she was having trouble processing information and was having some cognitive difficulties. And they actually asked a psychologist to visit with her. He visited with her. That's Dr. Anderson, as referred to in the record. And he's the one who said this would be beneficial. The thing is, nothing came of that in terms of any kind of adverse action to her. She was paid the whole time. There's no dispute that she continued on a leave of absence. She started her first year over again and was experiencing the same problems. And again, the appellant argues that she had no indication of all of her performance difficulties. Well, in addition to the evaluations, which are all a part of the record, there's a 35-page document. They get feedback at the end of each of the rotations. Dr. Birch had concerns. Dr. Joukowsky had concerns. That led to a decision by the Clinical Competency Committee to put her under review in September. And I would commend to you the document that was produced by Dr. Joukowsky, who was the program director. But it basically outlined the concerns of the Clinical Competency Committee. And it lists specific deficiencies. And then it refers to... Counsel, would you give us a record site if you're referring to something we should look at? Yes, absolutely. It's Appendix 129. The original determination that she needed to repeat her first year is Appendix 78. And that lists the eight subcompetencies that were at issue. And then the notification of under review is Appendix 129. And it actually lists physicians and what their concerns were. Dr. Joukowsky, Dr. Birch, Dr. Abu-Azim, Dr. Mirza. And so we acknowledge that there were some physicians, primarily those that were in clinic, where she did get favorable reviews. She had good rapport with patients. She's basically dealing with patients who are less complex than hospital-based patients. And the physicians who had concerns about her were those that were working with her in the hospital. And obviously, when you turn out a physician who's an intern, you don't know if they're going to end up being in a clinic or a hospital. So they need to be able to cover the responsibilities. And the biggest concern they had, and there's a number of comments about this in the evaluations, she required more supervision. In fact, there were concerns that she was taking away the supervisor's attention from other interns who needed supervision as well. She just wasn't able to handle the situation. And that led ultimately to her being placed on probation December 20. And that document is Appendix 132. And again, it goes through the difficulties that she was having. Shortly after that, we had this incident that Judge Loken asked about in the emergency room where a patient was admitted, was having a pulmonary embolism. The Coumadin that the patient was on had failed. And they got the patient stabilized. And Dr. Canning, as a part of the discharge, was going to release the patient with Coumadin, even though that was the anticoagulant that had failed. And that would have occurred had it not been for a nurse catching Dr. Canning's error. This is a serious medical error. And as a result of that, a decision was made that in light of all of the problems, it's not just this incident, but her whole history of difficulty, she was not accomplishing doing what she needed to do in order to move from a position of dependence to a position of independence. And one- Mr. Buntain? Yes. Has Creighton discharged other residents for the same violation? There's no evidence in the record that they have. The evidence on similarly situated employees is sparse. The only evidence in the record is that there were several other residents who were disciplined for competency issues. But as the court found, the appellant didn't point to any other similarly situated resident who was- Well, wouldn't that tend to say that what she got was a death penalty, whereas most people who've made those omissions have simply been sanctioned and allowed to continue? Well, there's no evidence that anyone else has made this kind of omission, number one. And number two, there's no evidence relating to any other residents who had had the scope of problems for the period that she had that had this incident occur. This incident did not occur in isolation. She was not a stellar resident who made a mistake. She was a struggling resident who had great difficulty who made an error. And it was really reflective of the issues that they had seen throughout the time. And I would especially commend to the court's attention a memo that Dr. Chikowsky gave to her supervisor after this ended, it's Appendix 145, in which she basically summarizes the reason for the termination. She concludes by saying, the CCC feels that our program has given Marybeth Kann and 12 months of residency training, and while she's improved some, her incompetency is negatively impacting patient safety, does not predict success in the future. Her insight into her deficiencies has been very poor throughout. She does not seem to have insight into the fact that her patient care and medical knowledge deficits pose significant patient safety issues. Regrettably, that was confirmed by the December 24, 2016 near miss and her failure to even understand her error. The record is clear that she was terminated due to performance issues and it had nothing to do either with her age or any perceived disability or because they received a letter from a lawyer. Thank you, Mr. Thank you. Ms. Vessel, your rebuttal. Thank you, Your Honor. Well, as you might expect, almost everything that he said is disputed in the record. And let me just start with the statement that there was no evidence that anyone else ever made this error. Dr. Griffin said it happens a couple of times a month. It's so common. Creighton, that's their doctor. It's their faculty member. Creighton, it's so common. They have their pharmacist talking to the residents about what is a common problem. She was treated differently. Going back to the very first time, December of 2015, when she was voted off the island by the committee, that was just two weeks after the month in which they, Creighton, had decided not to train her, the only person on the new computer software program that they had talked to everybody else. So how could she, having had four months of satisfactory evaluations, all of a sudden come up with all these things that have just been told to you? Because there was a decision at some point early on that they were going to get rid of this older resident. And we don't know why, but we know that the reasons given were false, that she didn't have medical knowledge even in the record. The court said it was an error of omission. Dr. Griffin testified it was an error of omission. Even Dr. Joukowsky's own termination letter said it was an error of omission. She did not lack medical knowledge. She was getting satisfactory evaluations for a first-year resident who had been treated the way she had been treated from the start. So the other points I wanted to cover very quickly, if I still have time, is that he said she wasn't able to handle complex cases. When she returned the second part of her tenure, that was repeatedly told to her that she was unable to think clearly and she was confused. She was repeatedly harassed with disparaging remarks, and we've shown that in our briefs. The other thing about supposedly her needing more supervision, well, she confessed and she admitted that her medical school training was different than if you attend medical school in the United States, and they accepted her anyway. So that was part of the fact that she was going to need a little more But the fact is the older faculty got along famously with her. They wrote special recommendation letters for her and treated her very well and thought highly of her, thought she was just like the other residents. That was the way it was stated. One of the other things was that the exam that he referenced early on, those were practice exams. So those are treated like practice exams. If we lawyers were graded on our LSAT practice exams, we'd never get admitted to law school. The same thing, the first evaluation of her in November of 2015, that was not with reference, and that evaluation is not part of the record suspiciously because it didn't have to do with any of her medical knowledge or medical cognition or anything. It had to do with the fact that she couldn't operate the computer system that they didn't treat her on. So I think I've made most of the remarks I was going to make, Your Honor. We would ask you to reverse the case and remand it. All right. Thank you, Counsel. The court wishes to thank both of you for appearing before us today  In addition to the briefing that you've submitted, we will take the case under advisement. You may be excused.